**Affirmed and Memorandum Opinion filed December 5, 2024.**



In The

# Fourteenth Court of Appeals

## NO. 14-24-00427-CV

## IN THE INTEREST OF D.Y.V.-M. AND G.E.M., CHILDREN

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2023-00670J**

## MEMORANDUM OPINION[1]

The trial court terminated the parental rights of appellant K.M. ("Mother") to her two young daughters, G.E.M. ("Gema") and D.Y.V.-M. ("Darby").[2] In her appeal, Mother acknowledges and identifies the legally sufficient evidence to establish each of the trial court's four predicate findings and only argues that the evidence was legally and factually insufficient to support the trial court's finding that termination was in the children's best interest. We affirm.

---

[1] Justice Spain concurs in the judgment only without opinion.

[2] "Gema" and "Darby" are pseudonyms. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal concerns appellant Mother and her two daughters—Gema born in July of 2019, and her younger sister Darby, born in June 2021.

### Removal, Pre-Trial Reports and Events[3]

In March 2022, Mother was investigated by appellee Texas Department of Family and Protective Services ("the Department") on allegations of using crack cocaine and heroin while caring for her children. The case was closed with a "Reason to Believe" notation.

The girls came to the Department's attention again in March of 2023 when Mother left the girls with a babysitter to watch them for a couple of hours. The babysitter texted Mother at 3:00 A.M. the next morning after Mother failed to appear; Mother responded that she would be coming to pick the children up shortly. When the babysitter texted again at 8:00 A.M., Mother responded that the children's aunt would come to pick them up. However, when evening arrived no one had come to retrieve the children and Mother's whereabouts were unknown.

While bathing the children, the babysitter's concerns compounded when she noted discharge from Gema's vaginal area and bruising on Darby's back. The babysitter called the police, and the children were transported by ambulance to Texas Children's Hospital where they were admitted at 1:02 A.M. on March 27, 2023. Medical records of the visit included a description of the children's medical condition, noting the vaginal discharge and "obvious" bruising witnessed by the children's babysitter. The records reflect that the child's discharge was not due to infection but may have been caused by poor hygiene, and that the bruising and

---

[3] Background facts pertaining to the removal, reports and other matters leading up to the trial are generated from the testimony and various reports and letters admitted in evidence at trial without objection.

vaginal discharge "could be consistent with abuse / neglect."

A Department investigator arrived at the hospital, spoke to staff, observed the children at their bedside, and made attempts to locate the children's parents or any relatives who might be available to pick up the children. According to the records, the investigator contacted the children's paternal grandmother who made plans to come to the hospital, but the investigator was initially unable to contact the parents to obtain consent for the grandmother to take the children. A report authored by the children's guardian ad litem detailed that Mother and Father[4] eventually came to the hospital and admitted to having used drugs. At the time, the children's paternal grandmother was involved in an ongoing CPS case so she could not serve as a placement or monitor for the children. When asked about the bruising, Mother reported that the child had birthmarks, but the doctor who authored the physician statement indicated the marks were bruises.

The Department took emergency custody of the children on March 27, 2023 and filed its original petition the following day, requesting, among other relief, to be named as the child's emergency temporary managing conservator. The trial court granted the request in an Order for Protection of a Child in an Emergency signed that day and found that the Department made all reasonable efforts to prevent or eliminate the need for the removal, but there was an immediate danger to the children warranting their placement in the Department's emergency conservatorship, and set the case for an adversarial hearing.

Two days later, on March 30, 2023, Mother took a drug test indicating she was positive for both cocaine and marijuana.

The court held the adversary hearing on April 13, 2023. In its order from this

---

[4] "E.V.V." was the alleged father of Gema, and confirmed father of Darby, ("Father"). According to the record, Father passed away on October 23, 2023, while this case was pending.

3

hearing, the court found there was a danger to the children warranting their continued placement in the Department's possession and maintained the Department's appointment as the children's temporary managing conservator. Furthermore, the court ordered the parents "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit."

The court ordered Mother to appear for drug testing before April 14, 2023 – the day after the trial court's adversary hearing – but she failed to do so.

*Family Service Plan*

On May 5, 2023, the Department filed Mother's family service plan ("the Plan"). The Plan set forth several concerns regarding Mother's parenting, as well as goals and services for her to complete to obtain her children's return. It noted that the Department found reason to believe that Mother abused and neglected the children and that because of her drug use and neglectful supervision, the children could be placed in a dangerous situation if returned to her. It stated the goal that she work with the Department and other professionals to "understand the serious nature of the situation that placed her children in harms [sic] way," and that she "alter her behavior that exposed herself and her children to drug usage," and "demonstrate an ability to keep a clean home free of drug [sic] that is suitable for herself and a [sic] children in her care."

As concerns to be addressed, the Plan stated that Mother "severely mismanages available resources," which resulted in "unmet basic care needs of housing, food, and clothing for the children." The Plan detailed that the family's house lacked adequate plumbing, heating, or food, and that the children "chronically present[]" with unclean clothing. It stated also that she had "unrealistic expectations and gaps in her parenting skills," and lacked "knowledge

4

of developmentally appropriate disciplinary methods," which interfered with her ability to provide effective parenting. Further, the Plan noted that she had a "limited support system," and was "isolated, or is reluctant to use available support." The Plan stated that she was involved in substance use which "results in behaviors that impede her ability to meet her own and/or her children's needs," and demonstrated "periodic mental health symptoms," including "depression, low self-esteem or apathy." Finally, the Plan stated that her relationship with the children's father was "characterized by increased disruption of positive interactions coupled with lack of cooperation and/or emotional, or verbal abuse."

To address these concerns, the Plan required Mother to attend all court hearings and case conferences; provide proof of income as well as safe, stable housing for a period of six months; complete parenting classes; provide the Department with contact information for appropriate family members who might help provide placement for the children; submit to random drug testing; and complete drug and alcohol, psychosocial, and domestic violence assessments, and follow any recommendations from those assessments.

On May 31, 2023, the trial court held a Status Hearing to review and approve the terms of the Plan. In its order following the hearing the court found Mother had reviewed and understood her Plan and was advised that unless she demonstrated the ability to provide the children with a safe environment, her parental rights could be restricted or terminated. The court made the terms of Mother's Plan a part of the orders of the court. The court also included orders stating that visitation with the children was "suspended for both parents until they show up, provide a negative test, and engage in services." Further, the order provided that any visitation "will require 24-hour notice of intent to visit."

*Department's February 27, 2024 Permanency Progress Report*

5

On February 27, 2024, the Department filed a permanency progress report, which included details about Gema and Darby, as well as Mother's progress on her service Plan.

The report reflects that the girls were placed in a foster home on March 27, 2023 when they were initially removed by the Department, and lived in that home until it closed on October 13, 2023. They were then moved to a second foster home. However, during the pendency of the suit the Department located a maternal aunt in Tennessee, who was approved as a placement, and both girls were moved into her home on February 5, 2024, where they remained when trial began. The report shows that, following the move, both girls had adjusted well to the aunt's home and were participating in "age appropriate activities there."

The report describes Gema as, at times, "very shy," and that she enjoyed playing with her dolls and watching cartoons. The child participated in a mental health assessment on May 11, 2023, shortly after being removed by the Department. The results from the assessment stated that Gema was behind developmentally, was "acquiring adaptive skills more slowly than most of her age peers," and had "well-below average language and academic/cognitive development, and low average physical development." The assessment explained Gema's condition as a result of "likely neglect, impoverishment in her early experiences, perhaps over-stimulation as well." The assessment diagnosed Gema with "Child Neglect, Confirmed," and "Unspecified Communication Disorder." The report also shows that Gema was prescribed medication to address seizures.

Darby was two years' old when the report was filed, and it described her as a "friendly and bright" child who "loves her big sister and enjoys playing with her," and who, like her older sister, "likes playing with her dolls and watching cartoons." She was too young to be assessed but, the report shows, she had been to medical,

vision, and dental checkups and, "participates in activities with her older sibling and attends age appropriate outings with her caregivers and sibling."

With respect to Mother, the report details that she completed some of the services required of her but had several yet to finish. The report states, Mother "is currently not engaged in services." It details that she traveled to Honduras during the month of November, 2023 to attend the burial of Darby's father, but failed to notify the caseworker. At the time the report was filed, Mother was living in Dallas, Texas, "due to being fearful of retaliation by the individuals that [sic] killed [the father]." The Department therefore assigned her a courtesy worker to assist Mother with completing services there.

According to the report, Mother completed parenting classes, provided the Department with the names of possible family members who might provide the children with a placement, and participated in psycho-social and domestic violence assessments. However, Mother had not yet completed a substance abuse assessment or provided any information to the Department about whether she obtained employment. The report states that Mother's visits with the children had been suspended since May 31, 2023, when the court conditioned her visitation on her providing a negative drug test and engaging in services.

Moreover, she failed to complete many of the services recommended by her assessments. The results of the psychosocial assessment show that Mother was diagnosed with "Stimulant Disorder, severe," as well as "Major Depressive Disorder, moderate, recurrent episode." It listed other conditions as well, including "Child Neglect, confirmed," "Child Physical Abuse, Confirmed," "Personal History (past history) of spouse or partner violence, physical," and both economic and housing problems. Additionally, during the assessment, Mother identified her drug of choice as crack cocaine and reported using the drug on a

7

daily basis.

The assessment also recommended several services, including random drug screens "to ensure sobriety"; both inpatient and outpatient substance abuse treatment to address her "ongoing drug use"; parenting classes to address how to properly care for and parent young children "due to concerns of child neglect and physical abuse"; individual therapy to address depression and Mother's coping skills, history of domestic violence, neglect and physical abuse of the children, past trauma, and her "drug use and the impact on her ability to care for her children's needs." Other than the parenting classes, the report shows that Mother "still needs to follow through" with the psycho-social assessment recommendations.

With respect to Mother's domestic violence assessment, the report states, "case reporting and interview indicate client is a victim of domestic violence." Accordingly, it recommended domestic violence group or individual counseling. The report states that Mother had failed to follow through with this recommendation as well.

Finally, the report, in addition to other evidence in the record, shows that Mother failed to participate in some of the drug tests required of her and tested positive for illegal drugs on several occasions. As noted above, she tested positive for cocaine and marijuana on March 30, 2023 and failed to appear for a court-ordered test on April 14, 2023. Subsequently, Mother failed to appear again for testing on June 2, 2023, and was positive in testing on July 5th, 9th, and 21st, 2023 for cocaine, and on July 27, 2023 for cocaine and marijuana. Lastly, she was positive again for cocaine on October 5, 2023, and provided a negative test result on January 12, 2024

*Child Advocate Report filed March 17, 2024*

A report submitted by the guardian ad litem for the children (Child Advocate

Report) included the recommendation that parental rights be terminated and the Department be named sole managing conservator of the two girls. The Child Advocate Report listed concerns that, while Mother initiated some of the services listed in her family service Plan, she failed to complete it. It also recounted that following the court's Status Hearing in May, Mother moved to North Carolina to find work, but then moved back to Houston at of the end of August, 2023 and moved in with her sister. At that time, she participated in a Family Group Conference at which the services listed in her Plan were discussed, and the Department provided her with referrals for those services. In September, Mother moved again, this time to her cousin's residence, and reported that she was working at Men's Warehouse, but failed to provide proof of any income. Subsequently, after Darby's father was killed, Mother relocated to Dallas.

The Child Advocate Report also set forth Mother's drug test results, including the positive results for cocaine and marijuana in March, two positives for cocaine and marijuana in July and a positive result for cocaine in October of 2023. Despite these results, Mother reported to the Child Advocate that she last used drugs in June of 2023, at which time she said she used "crack cocaine."

With respect to the children, the Child Advocate Report stated that they were placed with their aunt in Tennessee, but the aunt had since expressed inability to keep them for longer than two to three years. As a result, the plan was for the children to remain in that home until an adoptive placement could be found. The advocate had observed the children virtually in their aunt's home and reported that "both children seem happy and smiling," and were "up to date with medical appointments."

## Trial

The trial began on March 19, 2024, wherein the above discussed reports

were admitted into evidence and the following witnesses testified:

*1. The Department's case supervisor, Shamaila Khan*

The Department called Shamaila Khan, the supervisor over the case involving Gema, Darby and their Mother. She testified that the children were removed on an emergency basis following a report alleging that the children were abandoned by Mother when she left them with a babysitter and never returned, nor could she or the children's father be contacted. Khan reported that the children were taken to Texas Children's Hospital where they were examined, which revealed that one child had bruises, and the older girl had some discharge which indicated poor hygiene. Khan testified that Mother "was validated on neglectful supervision, physical abuse and abandonment." Kahn confirmed that Mother was drug tested at the time of the children's removal and showed positive for cocaine. At the time, the Department was concerned that Mother was not readily available to parent the children, was parenting them while under the influence of illegal drugs, was "unable to keep up with their hygiene," and lacked stability in her housing and employment.

When asked about Mother's housing stability at the time of trial, Khan responded that since December 2023, Mother had been living with the deceased father's mother in Dallas. Khan testified that Mother moved several times during the suit, which was consistent with her conduct during a previous case with the Department in 2022 also involving Gema and Darby. Like the present suit, the previous case involved Mother's cocaine use and lack of stability. At that time, Khan explained that Mother was unemployed and lived with her sister and her sister's boyfriend. Khan said the investigation in that case was closed, however, in May of 2022 when Mother enrolled herself in services at "Santa Maria with both of her children with her at the Bonita House."

10

According to Khan, Mother had apparently suffered a relapse when this case began in March of 2023. The Department provided referrals for services on April 6, shortly after the children were removed, and Mother enrolled herself again in Santa Maria for treatment near the end of June, 2023. However, Mother left the program again "against their recommendations… according to her, because of COVID." Then on July 31, 2023, Mother notified the Department's caseworker that she was moving to North Carolina because Mother reported a family member knew of employment for her.

Khan testified that when Mother was living in North Carolina, Mother was advised that the Department could not pay for services outside of Texas. Khan explained that Texas-licensed providers are not allowed to provide services in another state. Khan said Mother was advised she would have to pay for any out-of-state services herself and release or share records of any out-of-state services she completed. Khan testified that Mother had not provided the Department with any records or progress notes from any service providers to show that she participated in any of the services required by her family service Plan.

The next contact Mother had with the Department after she moved to North Carolina was on September 20, 2023 when she met with the Department's caseworker in person. Mother attended a court hearing on October 4, 2023, but then later that month went to Honduras after Father was killed. She was there until late November and then the Department was notified on December 21, 2023 that she was living in Dallas. At that point, Mother informed the caseworker that she wished to start participating in services. The following month, the Department submitted a referral for a courtesy worker to assist Mother in Dallas, but said they had no control over the assignment. Khan later explained that the Department does not pay for inpatient services, and it was the parent's responsibility to contact the

11

provider for those services.

With respect to Mother's drug use, Khan said Mother acknowledged that her drug of choice was crack cocaine. Additionally, she missed court-ordered drug tests in April and June of 2023. Khan said the missed tests indicated that Mother's "ongoing drug use was causing her not to submit to the drug testing." Khan said further that at the time the children were removed, Mother had "very high levels of cocaine in her hair," and had "cocaine metabolite in her UA." Khan therefore assumed Mother was using "a lot of cocaine" around the time she abandoned the two girls. Subsequently, in July of 2023, Mother was positive in two tests that showed "still – pretty high levels of cocaine in her system…" Khan confirmed that the level of cocaine metabolite in Mother's system on July 9, 2023 was actually higher than what was shown in the March 30, 2023 test. Additionally, Mother was still testing positive for cocaine as late as October 5, 2023, though Khan said the levels of drugs in her system were lower. Khan agreed that Mother's drug use was "very consistent and continuing," and reiterated that Mother's drug use went back to March of 2022, so was not just a recent concern.

Khan testified that Mother was pregnant with another child, was "just about due," and it was possible Mother had continued to use drugs despite her pregnancy because she never showed negative in a drug test from March of 2023 until January of 2024. Khan thought Mother's drug use constituted a danger to the two girls because Mother had not been able to demonstrate "any long-term sobriety to reflect that Mom has indeed changed behavior to be physically, emotionally, mentally present to care for her children."

Khan testified that Mother's drug use was also concerning because of Gema's special needs. The Department was making attempts to have Gema assessed for autism at the Texas Children's Clinic. At over four years old Gema

was still in diapers, was verbally delayed and needed speech therapy services, and experienced seizures which required seizure medication and follow-up appointments with a neurologist. Khan expressed further concerns from an assessment indicating that Gema's developmental delays were secondary to early neglect. Khan was also concerned that Mother had failed to participate in the services required of her because Gema had a condition that required urgent attention.[5]

With respect to the Gema and Darby's current placement, Khan said the Department conducted an extensive evaluation of the maternal great aunt's home and the great aunt completed a home study in Tennessee before the girls were placed with her. Additionally, she had expressed interest in having the children placed with her throughout the case. The maternal great aunt had been meeting the children's needs but recently informed the Department that she could not provide a long-term home for the girls. Khan also looked at several other relatives, including the children's maternal aunt, a paternal aunt, Maternal Grandmother, and Paternal Grandmother, each of whom she denied as possible placements. The maternal aunt had history with the Department from 2022 in which drug testing showed she was using cocaine. Moreover, Mother lived with her during the case at a time when Mother was showing positive for cocaine. That circumstance, Khan testified, precluded placing the children in that home. Khan also denied Maternal Grandmother as a possible placement because she reported to the Department that she saw no concerns regarding Mother's ability to parent even though Mother was "extremely high on drugs." The paternal aunt had only been in the U.S. for one year, did not know if she was going to be filing for asylum, was driving without a

---

[5] Khan explained her concern for Gema's care was that she "had had these issues or developmental delays, the sooner you catch them and address them, there's more chances of more success…at an earlier age than having to wait until they're 5, 6, 7, 10 years old."

license, had never met the children, and had no resources or backup caregivers to support them. Accordingly, Khan conducted a broadcast for the children and found three homes that she believed would be a good fit for the two sisters. It was Khan's plan to have one of those homes selected by the next day.

Khan was recalled to testify several days later, and reported that (since the time she had previously testified) the children had been moved into an adoptive foster home, and it was the Department's goal for them to stay there and be adopted by that family. She also said that, since the previous trial date, she had received nothing showing Mother had completed any additional services.

When asked about the children's father, Khan said from what the Department learned from Mother and the children's paternal grandmother, "both [Mother] and [Father] were purchasing drugs from somebody that somewhere went wrong and the dad was murdered and [Mother] was afraid for her safety and life, which caused her to move to Dallas." Paternal Grandmother contacted the Department and asked the Department to provide "some kind of shelter for mom or a place where Mom can be safe and these people that have murdered the father would not come after the mother." The situation was concerning for Khan. Given the grandmother's request to find some kind of shelter for Mother so that she could be protected from the father's murderers, Mother's home did not sound like a safe or stable placement for the two girls. If returned to Mother's care, Khan said, the girls "could be in the middle of something that they have nothing to do with and [the] parents' actions [could] cause a bad reaction for the children."

Khan testified that she believed terminating parental rights was in the children's best interest. She said Mother had the opportunity beginning in March of 2022 to make the changes that "the children need, deserve," to provide them with "a permanent home, stability, drug-free environment, a present parent that can

14

meet [the] social, emotional, physical needs of the children."

Kahn indicated that while the children were in the Department's care, they had a place to live and did not need to "worry about being fed, they don't have to worry about where they're going to sleep tonight," and the Department had plans to obtain a "permanent, safe and stable home for these two children."

Khan agreed that Mother completed a substance abuse evaluation in Dallas, which recommended three sessions of outpatient treatment, but was unaware whether Mother completed those sessions. Khan, however, explained that the assessment Mother completed in Houston had already recommended inpatient treatment and that, while Mother began that inpatient treatment in July, she left before the treatment was complete. In Khan's view, "even though [Mother] completed a new substance abuse assessment that does not recommend inpatient, she still did not follow the recommendation of the initial assessment; and so, therefore she has failed to complete what was asked of her." Khan explained that if Mother had completed the services when she first enrolled in the inpatient facility, "her children could've been returned."

Khan acknowledged that Mother completed parenting classes, a psychosocial assessment, and a domestic violence assessment, but Khan was unaware of any progress Mother had made on the recommendations from those assessments. Mother failed to address her diagnosis of severe major depressive disorder with therapy, nor had she participated in domestic violence group or individual counseling. Additionally, Mother failed to provide proof of any income.

*2. Child Advocate, Esther Gonzalez*

The Department also called Esther Gonzalez, the Child Advocate appointed to be the children's guardian ad litem. Gonzalez agreed with the Department that parental rights should be terminated and shared Khan's concerns about Mother's

instability.  Gonzalez said it was "definitely concerning that at the [] court hearing in October, she was testing positive still."  Gonzalez also reported that in September Mother said that she was no longer in a relationship with Darby's father and had distanced herself from him because he was engaged in drug use. However, Mother revealed in December that she was approximately three months pregnant because she had reengaged in a relationship with him before he was killed. Therefore, Gonzalez said that she was concerned about Mother's repetitive behaviors and lack of stability and noted that despite knowing she was pregnant Mother was still positive for illegal drugs.  Gonzalez testified that she was not sure how long Mother had been able to maintain sobriety and did not believe that Mother was able to meet the children's needs or provide them with a safe and stable environment.

With respect to the children, Gonzalez said that their aunt had been meeting their needs and they had done very well in her home.  She said that after all the work it took to get the children placed with her, the aunt surprised everyone by saying that she was not interested in adopting them.

*3. Mother*

Next, Mother testified—largely about her whereabouts after the children's removal, her participation in services, and her excuses for falling short of completing services. Mother also acknowledged facts unfavorable to her case.

Mother testified that in December she moved to Dallas to live with the Paternal Grandmother after a friend of Father killed him, but she denied that the murder had anything to do with drugs.  She said too that she moved to North Carolina during the case to find work, but moved back after a month when her search was unsuccessful.  When she returned to Houston, Mother said she worked at a warehouse for two months but left that job when Darby's father was killed.  At

16

that point she went to Honduras during the month of November because, she said, she was the only person available to claim the body of the deceased.

Since moving to Dallas in December, she said no one from the Department had contacted her to tell her she could complete her services virtually. She testified that she reached out to the Department multiple times but received no response, or a negative response.

On the second day of trial on April 3, 2024, Mother testified that she was participating in services in Dallas and had completed "two sections of domestic violence" out of seven required and was working on the third. She said, too, that she was "going to be completing [individual] counseling," which was beginning next week. She already completed a substance abuse assessment "because I was tired of waiting and I wanted to go ahead and take my own initiative." The results of that assessment recommended three counseling sessions, which she also completed. She said that she sent the results of the evaluation and the completion of the substance abuse sessions to the Department's caseworker. She said she had not been drug tested since moving to Dallas but provided a negative test in January and averred that she had not used illegal drugs since June of 2023.

Mother told the judge that she was doing everything possible to get the girls back. She said, "I know that I have made a mistake and I am now trying to remedy that mistake. I knew that I had time to complete things and I didn't, but now I am completing them." She said the loss of Darby's father was difficult for her but was "willing to go forward in order to get my girls back."

On cross-examination, Mother acknowledged that the children were placed into the Department's custody in March of 2023 at a time she was using crack cocaine daily. Mother denied, however, that she abandoned her children with a neighbor and failed to return. She also denied that she was not present at the

17

hospital with the children. Mother acknowledged, however, that though she was ordered by the court in May to participate in services, she did not begin working on those services until October of 2023. At that time, Mother completed a psychosocial assessment, but she said she did not know that the assessment recommended inpatient substance abuse treatment because, as Mother explained, "They never told me any of that." Mother also said the Department's caseworker told her the inpatient treatment "wasn't – not that it wasn't necessary, but she said that it wasn't obligatory." Nonetheless, she enrolled in an inpatient program at Santa Maria, but left after a week "due to COVID," and did not complete the treatment. She also testified that she had no employment in Dallas, had not yet begun therapy, and acknowledged having moved to the city while knowing that her children were either going to be living in Houston or Tennessee. Mother acknowledged that she found out she was pregnant in August and was due on April 20, 2024.

*4. Maternal Grandmother*

Mother's mother ("Maternal Grandmother") testified next. Maternal Grandmother wanted to be considered as a possible placement for the two girls and said no one from the Department had contacted her. She acknowledged she had history with the Department involving Mother when Mother was approximately 13 years old. Maternal Grandmother denied knowledge of Mother's drug use. She said Mother was not living with her and that she had to call the police to help her get into her daughter's apartment, and "when I got in there I didn't know what had been happening." When asked what she did when she found out about Mother using drugs, she testified that a neighbor called the Department, that Mother enrolled in a drug rehabilitation program, and it was her understanding that Mother was no longer using drugs.

Maternal Grandmother testified that she lived in Houston, resided with her three-year old son, and worked "at cleaning some offices." She believed she could provide a long-term, safe and stable place for Gema and Darby and said if she knew Mother were using drugs again, she would keep the children away from her.

On cross-examination, the Maternal Grandmother denied knowledge that Mother was using cocaine on a daily basis in 2022 during her previous case with the Department. Maternal Grandmother said she saw Gema, Darby, and Mother all the time in 2022, but failed to notice Mother's drug use, she said, "because they lived alone. And when I would get – when I would go and visit them, I didn't – I didn't realize." She denied, too, that either Gema and Darby had been abused or neglected and said, "[t]hat's a lie because there are no photographs or anything about that." And, when asked whether it was safe for a child's caregiver to be using crack cocaine, the grandmother's response was that "she left them with the babysitter…She never left them alone." She also denied that the woman with whom Mother left the children in March of 2023 had to call the police when Mother failed to return, stating "That's not – that a lie because she was a babysitter and she would watch the kids." She explained that the babysitter called the police because Gema "had an attack," and that Mother "was – she was – she was working and…her phone died." She said, too, that she had not before volunteered to care for the children because her sister was willing to take them, and when asked why she did not volunteer to be a placement when the children were first removed, she said, "Well, I know – of course I was willing, but they never asked me." She also said she did not call to check on the children because she knew "how busy you-all are and I didn't want to keep calling to bother you."

5. *Paternal Grandmother*

The mother of the children's deceased father ("Paternal Grandmother")

19

testified last. Paternal Grandmother lived in Houston until her son was killed, at which point she moved to Dallas. She said she felt unsafe in Houston because in July "somebody came and they were knocking really loud on my door." She said, however, she felt safe in Dallas. Paternal Grandmother had two siblings there and lived with one of them along with her two children and Mother. She had no concerns that Mother was continuing to use drugs and said she would not allow anyone who was using drugs to be around her children. At one point Paternal Grandmother testified that she wished to be considered a long-term placement for Gema and Darby and planned to move to a bigger house if she were eligible once the children were placed with her. In later testimony, she indicated that she and her brother were already living in a bigger house and that Mother lived in her old apartment. Paternal Grandmother said she was employed and believed she was able to provide the children with a safe and stable home.

Paternal Grandmother acknowledged being involved in a prior CPS case in which her 15-year-old daughter reported that the grandmother's son sexually assaulted her. However, she explained, her 15-year-old daughter later recanted and said she made the allegation so that she could go back to Honduras. Paternal Grandmother first testified that the Department's caseworker never asked her whether she would be interested in taking Gema and Darby, but later acknowledged that she had a conversation with the caseworker at a visit in which the caseworker asked her if she wanted to have the girls placed in her home. She said at that time she told the caseworker she was unable to because she was dealing with her previous CPS case with her 15-year old daughter. She also acknowledged telling the caseworker that she could not care for Gema and Darby because she had three children of her own. Paternal Grandmother also acknowledged again that a part of the reason that she left Houston was because of the trouble her son was in

20

because of his use of drugs.

## Trial Court's Judgment

On May 22, 2024, the trial court signed its Decree for Termination which ordered the termination of Mother's parental rights under subsections (D), (E), (N), and (O) of 161.001(b)(1) of the Texas Family Code, found that termination was in the children's best interest, and appointed the Department as the girls' sole managing conservator

## II. BEST INTEREST OF THE CHILDREN

Mother presents one issue: whether the evidence is legally and factually insufficient to support a finding that termination is in the best interest of Gema and Darby.

### A. Applicable Law and Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex.

21

Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283

22

S.W.3d at 345. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. The trier of fact may consider several factors to determine the children's best interest, including: (1) the desires of the children; (2) the present and future physical and emotional needs of the children; (3) the present and future emotional and physical danger to the children; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the children; (6) the plans for the children by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (the "*Holley* factors"); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the children with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72. Evidence that proves one or more statutory grounds for

termination may also constitute evidence illustrating that termination is in the children's best interest. *In re C.H.*, 89 S.W.3d at 28. And a fact finder may measure a parent's future conduct by his past conduct in determining whether termination of parental rights is in the children's best interest. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

**B. Did the trial court reversibly err by concluding that termination of Mother's parental rights was in the best interest of Gema and Darby.**

In conjunction with Mother's arguing points, we review the *Holley* factors in light of the evidence at trial.

The primary basis for Mother's best-interest challenge rests on her contention that the children were not living in an adoptive placement by the time of trial and there were relatives available to care for them. Mother argues that because a permanent placement for the children had not yet been found, there was no way to evaluate the *Holley* factors regarding the children's desires, their emotional and physical needs, the parental abilities of those seeking custody or the stability of the proposed home or placement. *Holley*, 544 S.W.2d at 371-72 (discussing factors one, two, four, and seven). She asserts, therefore, that each of these factors was neutral and, given the presumption that children should be placed with parents, weighed in Mother's favor.

Even if we were to discount Khan's testimony that the Department had successfully placed the girls in an adoptive home during trial, Mother's argument is not prevailing. Texas courts have repeatedly acknowledged the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor in the best-interest analysis. *In re C.H.*, 89 S.W.3d at 28; *In Interest of E.R.*, 555 S.W.3d 796, 810 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (finding termination in best interest despite silent record "as to whether or for

24

how long [child] will stay in his foster home following termination of Mother's parental rights"); *Interest of E.A.D.*, No. 14-22-00025-CV, 2022 WL 2663981, at *10 (Tex. App.—Houston [14th Dist.] July 11, 2022, no pet.)(finding termination in the best interest of the child even though foster caregiver had not affirmatively expressed interest in adopting child). Otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located. *C.H.*, 89 S.W.3d at 28. "Instead, the inquiry is whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *Id.*

Additionally, Mother claims that placing the children with biological relatives would alleviate any concern with respect to her ongoing drug use, and therefore the *Holley* factor regarding any emotional or physical danger to the children was also neutral and should weigh in her favor. This argument is legally untenable. Though placement within the family is relevant to other concerns, her argument is not germane to the particular termination analysis, as the same could be stated with respect to placement with the Department. *Interest of L.M.*, 572 S.W.3d 823, 837 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (noting that even when the Department has not yet considered a given relative, that fact "does not bear on whether termination is in the child's best interest."). The argument is also factually unsupported: the record does not support that the relatives suggested by Mother were viable placements who would ensure Gema and Darby's safety and stability. Khan testified that the Department had considered the relatives suggested by Mother and detailed the reasons why those relatives were rejected as possible placements, i.e.:

25

- ***Maternal aunt (Texas)***.  Khan testified the children's maternal aunt had history with the Department showing that she too was using cocaine in 2022 at the same time Mother and the girls were previously involved with the Department.  Moreover, Mother was residing with the aunt during the case while showing positive for cocaine.

- ***Paternal aunt***.  Khan considered a paternal aunt and rejected her as a possible placement because she had newly emigrated to the United States, had never met the children, did not know whether she would be applying for asylum, was driving without a license, and had no resources or backup caregivers to support the children.

- ***Maternal grandmother***. Khan had concerns too about Mother's mother because of Maternal Grandmother's denial regarding Mother's drug use.  Maternal Grandmother's testimony supported Khan's concerns and showed that the grandmother remained in denial about Mother's conduct and the danger she posed to the girls. At trial, said she had never been aware of Mother's use of cocaine.  Maternal Grandmother insisted that the girls had not been neglected or abused, because despite the medical records in evidence, "there are no photographs or anything about that."  She also denied that Mother had abandoned the girls with the babysitter and denied that the babysitter had to call the police because Mother failed to return.  She also acknowledged she had not volunteered to care for the children because no one reached out to her to ask her to and said she did not want to call the Department to check on the girls because she did not want to bother the Department about the issue.

- ***Paternal grandmother***. Khan had also considered and rejected the children's Paternal Grandmother. Though both Mother and Paternal Grandmother

26

denied any danger in Paternal Grandmother's home, Khan testified that she learned from them both during the suit that the reason they moved to Dallas was to avoid the people who had murdered Darby's father. According to what Paternal Grandmother and Mother told Khan, Mother and Father were involved in a drug sale that "went wrong," and Father was murdered. Mother was afraid for her safety and so moved to Dallas to live with the paternal grandmother. Khan said the situation was concerning for her because of the possible danger to the children if placed in Paternal Grandmother's home.

The only suitable relative, Mother's aunt in Tennessee, declined the long-term duty of adoption. Yet Khan testified that after initiating a broadcast to find an adoptive foster placement, the Department had reviewed several home studies and identified one she felt was a good fit for the girls. She reported that the Department received fifteen home studies after the broadcast, held a meeting to discuss the best three, and in considering the girls' Hispanic culture and the desire that at least one parent in the home speak Spanish, Khan selected the home she thought would best suit the children. Khan testified on the third day of trial that the two girls had recently been placed in that home and it was the Department's goal to have the girls be adopted by that family. Accordingly, the evidence did not show that there were safe, stable options for placing the children with biological relatives, but rather that the Department had reason to be concerned about all of the placements Mother suggested. As a consequence, rather than weigh against the trial court's best interest determination, a review of the relatives suggested by Mother instead supported that Mother had no viable plan for the children's care. See *Holley*, 544 S.W.2d at 371-72 (discussing factor six and seven regarding plans for the child and the stability of the proposed home or placement).

It is not insignificant to our analysis what Mother concedes on appeal—that the record demonstrated that she exposed the children to endangering circumstances, engaged in conduct which endangered their welfare, had minimal contact with the children while they were in the Department's conservatorship, demonstrated an inability to provide them with a safe environment, and failed to complete the services provided her to obtain the children's return, also provided weighty support for the court's best interest determination. Tex. Fam. Code § 161.001(b)(1)(D),[6] (E),[7] (N),[8] (O);[9] *Interest of A.C.*, 560 S.W.3d at 631–32 (noting that while proof of acts or omissions under Tex. Fam. Code § 161.001(b)(1) may not relieve the petitioner from proving the best interest element, the same evidence may be probative of both.").

---

[6] In her brief, Mother concedes that she "does not contest whether the evidence indicating she abandoned her children with a babysitter, and one of the children required medical treatment due to poor hygiene, is factually and legally sufficient to support the trial court's subsection (D) finding."

[7] In her brief, she states, "[M]other confirmed that when the children were brought into the agency's custody, she was smoking crack-cocaine daily. She admitted that her drug of choice is crack cocaine, which was the primary concern in both her CPS cases. Also, Mother is currently pregnant, and possibly used illegal narcotics during the pregnancy as she is nearly full term and has not provided a clean drug test between March of 2023 and January of 2024. [] The admitted drug test results and mother's admissions establish sufficient evidence to support the trial court's [subsection (E)] finding."

[8] In her brief, Mother concedes, "Mother does not dispute whether the evidence is sufficient to establish that (i) the agency made reasonable efforts to return the children; (ii) Mother has not regularly visited her children; and (iii) has not demonstrated she can provide the children with a safe environment. Tex. Fam. Code §161.001(1)(b)(N). In addition to the abandonment evidence listed above, mother admitted she had moved to North Carolina and Dallas and traveled to Honduras while her children were in the care of DFPS."

[9] In her brief, Mother concedes, "Here the agency prepared a Family Service Plan for the mother, which was filed with the court. [] The undisputed evidence establishes mother violated the terms of her court-ordered Family Service Plan by testing positive for illegal substances during the pendency of this case. . . Although mother indicated she was in substantial compliance with the service plan, it does not undermine the trial court's subsection (O) ground finding. The record establishes that Mother never provided any proof or records indicating she completed her court-ordered therapies."

Mother argues that the evidence established that she was no longer using illegal drugs. However, Mother's history of drug use going back to 2022 when she and the two girls were first involved with the Department; her admitted daily use of crack cocaine in March of 2023 when the Department intervened after the children were found abandoned with a babysitter showing signs of abuse and neglect; her failure during this suit to participate in court-ordered drug testing and her repeated positive results for cocaine in July and October of 2023; and her failure to address her substance abuse issues by completing court-ordered substance abuse services, all contradict her assertion that the evidence established she was no longer using drugs, and supported the conclusion that her drug use remained a concern and posed a continuing danger to the children's welfare as well as her own ability to care for the children and meet their needs. *See Holley*, 544 S.W.2d at 371-72 (discussing factors two and three regarding the children's physical and emotional needs and any danger to the children); *see also In Interest of A.A.Z.*, No. 14-17- 00276-CV, 2017 WL 3612259, at *11 (Tex. App.—Houston [14th Dist.] Aug. 22, 2017, pet. denied) (holding that a mother's drug use and attendant unstable lifestyle, in addition to her continuing use during a child protection suit, weighed in favor of the conclusion that termination was in the child's best interest).

Even if some of the *Holley* factors were neutral for lack of evidence, most factors were supported decisively by evidence favoring termination. Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's parental rights was in Gema and Darby's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

### III. CONCLUSION

We affirm the trial court's judgment terminating Mother's parental rights.

/s/     Randy Wilson
Justice

Panel consists of Justices Spain, Poissant, and Wilson. (Spain, J. concurring without opinion).